O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NEW CINGULAR WIRELESS PCS, LLC,
D/B/A AT&T MOBILITY,

                    Plaintiff,

        v.

CITY OF WEST COVINA, CALIFORNIA,

                    Defendant.

Case No.:  2:22-cv-01642-MEMF-JCx

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT [ECF NO. 45],
GRANTING IN PART CROSS-MOTION
FOR SUMMARY JUDGMENT [ECF NO. 45],
AND GRANTING REQUEST FOR
JUDICIAL NOTICE [ECF NO. 45-16]**

        Before the Court are the Motion for Summary Judgment filed by Plaintiff New Cingular
Wireless and Cross-Motion for Summary Judgment by Defendant City of West Covina, California
(ECF No. 45) and Request for Judicial Notice filed by Defendant City of West Covina, California
(ECF No. 45-16). For the reasons stated herein, the Court hereby DENIES the Motion for Summary
Judgment, GRANTS IN PART the Cross-Motion for Summary Judgment, and GRANTS the
Request for Judicial Notice.

/ / /

/ / /

1

## BACKGROUND

### I.    Factual Background

Plaintiff New Cingular Wireless PCS, LLC, d/b/a AT&T Mobility ("AT&T") provides personal wireless services to its customers, including to residents of Defendant City of West Covina, California (the "City"). In order to fill an alleged service coverage gap, AT&T submitted an application for a conditional use permit (the "Application") for the construction, operation, and maintenance of a stealth wireless communications facility (the "Proposed Facility"). The Proposed Facility was to be disguised as a eucalyptus tree and located at 3540 East Cameron Avenue (the "Site"), situated adjacent to two existing water tanks on private water district property in the City. This case concerns whether the City properly denied AT&T's Application to build its Proposed Facility. In particular, the issues before the Court are whether there is substantial evidence in the written record to support the City's denial of the Application and whether the denial amounted to an effective prohibition in violation of the Telecommunications Act of 1996.

### II.    Procedural History

On March 12, 2022, AT&T filed a Complaint against the City alleging three causes of action: (1) prohibiting the provision of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II); (2) lack of substantial evidence to support denial of a request to place, construct, or modify personal wireless service facilities in violation of 47 U.S.C. § 332(c)(7)(B)(iii); and (3) unreasonable discrimination among providers of functionally equivalent services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I). On March 8, 2023, the parties filed a joint stipulation to dismiss AT&T's third count for unreasonable discrimination. ECF No. 43. The Court granted the stipulation on March 21, 2023. ECF No. 51. On March 16, 2023, the parties filed a joint brief on AT&T's Motion for Summary Judgment. ECF No. 45 ("Motion" or "Mot."). The City cross-moves for partial summary judgment on the same issues raised by AT&T.[1] *Id.* at i. The City also filed a Request for Judicial Notice. ECF No. 45-16 ("RJN").

---

[1] AT&T asserts that such a cross-motion is improper under the Civil Standing Order, which provides: "The Court will not entertain cross-motions that seek to adjudicate the same legal issues. If parties wish to cross-move for summary judgment, their counsel shall meet and confer to determine which party will move and

### REQUEST FOR JUDICIAL NOTICE

**I.      Applicable Law**

A court may take judicial notice of facts not subject to reasonable dispute where the facts "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Under this standard, courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002). Moreover, even when documents are not physically attached to the complaint, courts may nonetheless consider such documents if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011); *Lee*, 250 F.3d at 688.

**II.      Discussion**

The City submits—and requests that the Court take judicial notice of—eight (8) exhibits in support of its Opposition to the Motion for Summary Judgment. RJN at 1–3:

1.   Excerpts of the General Plan of the City of Walnut (Exhibit A);

2.   West Covina Zoning Map, Hillside Overlay Zone (Exhibit B);

3.   West Covina Municipal Code section 26-696 (Exhibit C);

4.   West Covina Municipal Code section 26-247, *et seq.* (Exhibit D);

5.   West Covina Municipal Code section 26-685.986, *et seq.* (Exhibit E);

6.   Excerpts of the General Plan of the City of West Covina (Exhibit F);

---

which will oppose the one motion for summary judgment." Civil Standing Order § VIII(E). The operative version of the Civil Standing Order may be found on the Court's webpage at https://www.cacd.uscourts.gov/honorable-maame-ewusi-mensah-frimpong. The Court clarifies that this prohibition on cross-motions is a prohibition on duplicative and redundant briefs addressing cross-motions. It was not meant to abrogate any party's entitlement to seek summary judgment as provided for in Federal Rule of Civil Procedure 56(a). FED. R. CIV. P. 56(a) ("The court *shall* grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (emphasis added)). As briefed, the City's motion is appropriate and is therefore considered by this Court.

7.   "Design Guidelines for Small Wireless Facilities," adopted by the West Covina Planning Commission in 2019, by way of Planning Commission Resolution No. 19-5986 (Exhibit G); and

8.   West Covina Municipal Code section 26-685.1100, *et seq.* (Exhibit H).

RJN at 1–3. With respect to Exhibits A–H, the Court finds that these excerpts fall within the category of materials courts have deemed appropriate for judicial notice. *See Sierra Club v. Bd. of Supervisors*, 179 Cal. Rptr. 261, 66–67 (Ct. App. 1981) (noting that court has taken judicial notice of general plan guidelines); *Venuto v. Owens-Corning Fiberglas Corp.*, 99 Cal. Rptr. 350, 359 n.2 (Ct. App. 1971) (noting that court "took judicial notice of the zoning ordinance and zoning map" of city); *1119 Del. v. Cant'l Land Title Co.*, 20 Cal. Rptr. 2d 438, 440 n.2 (Ct. App. 1993) (finding portions of municipal code to be "relevant matters which are properly the subject of judicial notice"). The Court therefore GRANTS the Request for Judicial Notice.

## MOTION FOR SUMMARY JUDGMENT

### I.   Applicable Law

#### A.  Motions for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Under Rule 56(a), a court also has authority to grant *partial* summary judgment, or "judgment on less than the entire case." 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2737 (4th ed. 2022) (citing FED. R. CIV. P. 56(a)). Under Rule 56(g), a court that "does not grant all the relief requested by the motion . . . may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." FED. R. CIV. P. 56(g).

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." FED. R. CIV. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

**B.  Telecommunications Act of 1996**

Congress enacted the Telecommunications Act of 1996 (the "Act") in order "to promote competition and . . . encourage the rapid deployment of new telecommunications technologies." *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 576 (9th Cir. 2008) (citing Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56). The Act seeks to reduce "impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005). It does so in part by restricting the authority of state and local governments to regulate "placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(B).

*/ / /*

The Act provides in relevant part:

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

**. . .**

       (II) **shall not prohibit or have the effect of prohibiting the provision of personal wireless services**.

. . .

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities **shall be in writing and supported by substantial evidence contained in a written record**.

47 U.S.C. § 332(c)(7)(B) (emphasis added).

          i. <u>Substantial Evidence (Second Cause of Action)</u>

Although the term "substantial evidence" is not statutorily defined in the Act, the Ninth Circuit, in reviewing the legislative history of the Act, has recognized that this language is meant to trigger "the traditional standard used for judicial review of agency decisions." *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400 F.3d 715, 723 (9th Cir. 2005) (quoting H.R. Conf. Rep. No. 104-458, at 208 (1996)). The substantial evidence inquiry "requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*." *Id.* at 723–24. Substantial evidence implies "less than a preponderance, but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 725 (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)). "Review under this standard is essentially 'deferential,' such that courts may 'neither engage in [their] own fact-finding nor supplant the Town Board's reasonable determinations.'" *Id.* (quoting *Oyster Bay*, 166 F.3d at 494). "In applying this standard to the facts of a given case, the written record must be viewed in its entirety, including all evidence supporting both parties, and 'local and state zoning laws govern the weight to be given the evidence.'" *Id.* (quoting *Oyster Bay*, 166 F.3d at 494). In other words, a court may not overturn a decision on "substantial

evidence" grounds "if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence (i.e., more than a 'scintilla' but not necessarily a preponderance)." *Id.*

ii.   Effective Prohibition (First Cause of Action)

A wireless service provider has the burden of establishing effective prohibition. *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 997–98 (9th Cir. 2009). An effective prohibition occurs when a state or local government "materially inhibits" the provision of services. *City of Portland v. United States*, 969 F.3d 1020, 1034–35 (9th Cir. 2020), *cert. denied*, *City of Portland v. FCC*, 141 S. Ct. 2855 (2021) (mem.) (acknowledging "the continuing validity of the material inhibition test").

A wireless service provider may also establish effective prohibition by showing (1) it has a significant service gap, and (2) that its denied application proposes to close that gap by the least intrusive means. *MetroPCS*, 400 F.3d at 731; *Anacortes*, 572 F.3d at 997–98. A "provider makes a prima facie showing of effective prohibition by submitting a comprehensive application, which includes consideration of alternatives, showing that the proposed [facility] is the least intrusive means of filing [sic] a significant gap." *Anacortes*, 572 F.3d at 997–98. A significant gap in service—and therefore an effective prohibition of service— "exists whenever a provider is prevented from filling a significant gap in *its own* service coverage." *MetroPCS*, 400 F.3d at 733. Determinations of whether a "significant gap" in service exists are "extremely fact-specific inquiries that defy any bright-line legal rule." *Id.* The "least intrusive" prong requires the provider to show that "the manner in which it proposes to fill the significant gap in service is the *least intrusive on the values that the denial sought to serve.*" *Id.* at 734 (quoting *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 480 (3d Cir. 1999)).

When a locality rejects a prima facie showing of effective prohibition, "it must show that there are potentially available and technologically feasible alternatives." *Anacortes*, 572 F.3d at 997–98. The provider may then dispute the availability and feasibility of the alternatives proposed. *Id.* However, "where there is more than a scintilla of evidence to support a locality's disapproval of a particular site for a wireless cellular facility, a court's determination of whether the denial violates

the TCA turns on an evaluation of the availability and technological feasibility of the alternatives." *Id.* at 996.

### C.  West Covina Municipal Code

The West Covina Municipal Code requires telecommunications providers to seek and obtain a conditional use permit in order to build and operate a wireless telecommunications facility.   WEST COVINA, CAL., MUN. CODE § 26-685.986(a) ("Wireless telecommunication facilities consisting of free-standing wireless facilities shall be permitted subject to approval of a conditional use permit pursuant to division 3, article VI of this chapter."). West Covina Municipal Code § 26-247(a)(1) requires any applicant for a conditional use permit to show

(1) That the proposed use at the particular location **is necessary or desirable** to provide a service or facility which will **contribute to the general well being of the neighborhood or community**.

(2) That such **use will not**, under the circumstances of the particular case, **be detrimental to the health, safety, peace or general welfare of persons residing or working in the vicinity or injurious to property or improvements in the vicinity**.

(3) That the site for the proposed use is **adequate in size and is so shaped as to accommodate said use**, as well as all yards, spaces, walls, fences, parking, loading, landscaping, and any other features necessary to adjust said use to the land and uses in the neighborhood and make it compatible therewith.

(4) That the site **abuts streets and highways adequate in width and improvements to carry traffic generations typical of the proposed use** and that **street patterns** of such a nature exist as to guarantee that such generations **will not be channeled through residential areas on local residential streets**.

(5) That the granting of such conditional use permit **will not adversely affect the general plan of the city**, or any other adopted plan of the city.

RJN, Ex. D (WEST COVINA, CAL., MUN. CODE § 26-247(a)(1) (2023)) (emphasis added).

The Code further provides that "*[a]ny application* for a conditional use permit may be *rejected*, approved, modified and approved, or approved subject to conditions." WEST COVINA, CAL., MUN. CODE § 26-248. In addition, the Code states:

As part of a conditional use permit approval, **the planning commission may require development standards more strict than the regulations of this Code**

8

(e.g., less sign area, less building coverage, lower density, increased parking, increased fence or wall height, etc.) when such restrictions will mitigate potential impacts to surrounding properties or achieve **greater aesthetic or functional integration and compatibility with neighboring developments**.

*Id.* § 26-250 (emphasis added).

The Code enumerates additional conditional use permit application requirements, including (1) "a wireless telecommunication master plan for city review and approval," (2) a "justification study . . . indicating the rationale for selection of the proposed site in view of the relative merits of any feasible alternative site within the service area," (3) a "co-location study" that "examine[s] the potential for co-location at an existing or a new site," (4) a visual analysis "to ensure visual and architectural compatibility with surrounding structures," and (5) "[o]ther relevant information requested by the planning director or his/her authorized representative." RJN, Ex. E (WEST COVINA, CAL., MUN. CODE § 26-685.997 (2023)).

The Code also provides for the following "Development Standards" with respect to all wireless telecommunication facilities:

All wireless telecommunication facilities regulated under this division shall comply with the following development standards:

(a) Site selection.

(1) **City-owned properties shall be considered before privately-owned properties** where wireless telecommunication facilities are permitted.

(b) Location on property.

(1) Free-standing wireless facilities or roof-mounted satellite dishes greater than twenty-one (21) inches in diameter and located in residential zones.

a. No free-standing wireless facilities shall be permitted in the required side yard or front yard.

b. No free-standing wireless facilities shall be permitted within five (5) feet of the rear property line.

c. No antennas consisting of a solid or wire-mesh surface shall be permitted on the roof.

. . .

(c) Height restrictions.

> (1) **No free-standing wireless facilities shall exceed sixty (60) feet in height** measured from the average finished grade of the subject site, except as otherwise approved under section 26-685.990.

> (2) **No roof-mounted antennas shall exceed twenty (20) feet** above the peak of the roof (excluding the height of mechanical penthouses and parapets). . . .

WEST COVINA, CAL., MUN. CODE § 26-685.988 (2023)) (emphasis added).

The West Covina Municipal Code also provides for the following "Design Standards":

(c) Free-standing wireless facilities.

> (1) Free-standing wireless facilities shall be located a minimum of one-half mile from any other free-standing wireless facility, except as otherwise approved under section 26-685.990.

> (2) All free-standing wireless facilities shall be **stealthed to eliminate or substantially reduce their visual and aesthetic impacts from the surrounding public rights-of-way and adjacent properties**. For example, if a grove of palm trees exists at a proposed antenna site, then a manmade tree (monopalm) shall be used. If antennas are proposed to be located within the city's regional entertainment/shopping districts, **antennas shall be concealed** within signs, clock towers, or similar structures that are compatible with the surrounding land uses.

> (3) Free-standing wireless facilities designed as faux trees.

> > a. **Free-standing wireless facilities designed as faux trees shall bear a realistic resemblance to the type of tree that it is designed after to the greatest extent possible**, with emphasis on features including branches, fronds, leaves, needles, bulb diameter, trunk shape and trunk diameter.

> > b. The maximum branch/frond density and length shall be used to the greatest extent possible for antenna stealthing purposes.

> > c. All **cellular antennas** mounted to a faux tree (except mono-palms) shall have **"sock covers" installed over each antenna to simulate tree branches/leaves/needles**, etc. for additional stealthing.

*Id.* § 26-685.989 (emphasis added).

The Design and Development Standards fall within the same "Zoning" chapter of the Municipal Code—Chapter 26—but in a separate Article—Article XII, Special Regulations for Unique Uses. Within Article XII, the Design and Development Standards fall within Division 16 for "Wireless Telecommunication Facilities Within All Land-Use Zones," the purpose of which is as follows:

> This division sets forth a uniform and comprehensive set of development standards for the placement, design, installation and maintenance of wireless telecommunication facilities within all land-use zones of the city. The purpose of these regulations is to ensure that all wireless telecommunication facilities are consistent with the health, safety, and aesthetic objectives of the city, while not unduly restricting the development of needed telecommunications facilities.

*Id.* § 26-685.980.

## II.    **Findings of Fact[2]**

The Court finds that the following material facts are established for trial under Federal Rules of Civil Procedure 56(a) and 56(g).

On June 8, 2021, AT&T submitted to the City a permit application to install the Proposed Facility—a freestanding wireless telecommunications facility on Valencia Height Water District property in the City. AT&T SUF ¶ 1. The Proposed Facility includes a 60-foot monopole disguised as a eucalyptus tree with three trunks and 12 panel antennas arranged on three separate sectors (one per trunk). *Id.* ¶ 2. The antennas will be screened by faux branches and foliage and further concealed by antenna socks. *Id.* The Proposed Facility includes equipment cabinets in an 817-square foot ground area, screened by an 8-foot wall covered with climbing vines. *Id.* The faux eucalyptus tree would be surrounded by mature trees and accompanied by two new 24-inch box eucalyptus trees for additional screening. *Id.* ¶ 3. The Proposed Facility complies with the maximum height for freestanding wireless communications facilities set forth in the City's Development Standards— sixty (60) feet. *Id.* ¶ 5; *see also* WEST COVINA, CAL., MUN. CODE § 26-685.988(c)(1) (2023). The

---

[2] The facts set forth below are taken from the parties' Statements of Uncontroverted Facts and Conclusions of Law. *See* ECF No. 45-1 ("AT&T SUF"), 45-2 ("City SUF"). To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

Proposed Facility also complies with the minimum set-off requirement set forth in the City's Design Standards—one-half mile (2,640 feet) from any similar facility. AT&T SUF ¶ 8; *see also* WEST COVINA, CAL., MUN. CODE § 26-685.989(c)(1) (2023). The nearest existing wireless facility would be more than one mile (5,808 feet) from the Proposed Facility. AT&T SUF ¶ 8. The Proposed Facility meets the required 100-foot separation from any residential uses. *Id.* ¶ 9; *see also* RJN, Ex. A, at 51 ("Small Wireless Facility Design Guidelines"). Defendant's expert, Ben Levitan, concluded that the Proposed Facility would resolve 32% of the estimated gaps in LTE service within the larger geographic area. AT&T SUF ¶ 140.

The proposed Site is adjacent to Heritage Park, which is identified in the City's General Plan as a Wilderness Park with woodlands and kept in a nature state. City SUF ¶ 3. The proposed Site is zoned as single family residential and surrounded by residences. *Id.* ¶ 4. Nature trails and open space in the City of Walnut is to the south of the residences south of the proposed project location. *Id.* ¶ 5.

In connection with its Application, AT&T submitted a Radio Frequency Statement ("RF Report") from AT&T's radio frequency design engineer that explained the Proposed Facility was needed to close a significant service coverage gap. AT&T SUF ¶ 10. AT&T's RF statement stated that existing AT&T wireless service in the subject area of West Covina was inadequate because it did "not provide sufficient in-building LTE service in the gap area and [did] not provide sufficient in-vehicle service along significant routes in the [C]ity," and the Proposed Facility was thus necessary "to improve signal strength and signal quality in the area, which will improve overall coverage and increase data rates necessary for customers to receive consistently reliable wireless service." *Id.* ¶ 13. AT&T's RF Statement included propagation maps depicting the strength of AT&T's wireless coverage in the area, before and after installation of the Proposed Facility. *Id.* ¶ 15.

A duly noticed hearing on the application was scheduled before the City Planning Commission and held on October 26, 2021. *Id.* ¶ 35. City Staff drafted a Report recommending approval of the Proposed Facility:

> The proposed location . . . is both desirable and necessary to meet the demand for telecommunication service within the vicinity, . . . will reduce the 'coverage gap' that currently exists in the vicinity, . . . and will allow private utility service providers to . . . efficiently serve West Covina's homes and businesses. It will also

reduce the load on existing wireless facilities . . . to meet capacity needs, and provide new LTE service to the surrounding area.

*Id.* ¶ 17. According to the RF Report submitted by AT&T ahead of the City Planning Commission meeting, "there are no modeled exposures on any accessible rooftop or ground walking/working surface related to AT&T's proposed antennas that exceed the FCC's occupational and/or general public exposure limits at this site." *Id.* ¶ 25. AT&T also submitted the required Justification Study in advance of that meeting to provide "the rationale for selection of the proposed site in view of the relative merits of any feasible alternative site within the service area." *Id.* ¶ 28. The Justification Study purportedly included analysis of potential alternative sites and an explanation why each alternative was not feasible or available. *Id.* ¶ 30. The study also included a before and after map of projected AT&T cell coverage in the subject area, a depiction of the area's coverage gap, and an explanation for why the chosen site was the least intrusive means for closing that gap. *Id.* According to AT&T, two City-owned properties that it considered were unavailable because the City did not agree to discuss those potential siting options with AT&T. *Id.* ¶ 32. AT&T further reported that it had reviewed undeveloped private property in the area but ultimately determined the land to be unavailable because it was owned by a developer who declined to lease the space to AT&T. *Id.* ¶ 33.

During the October 2021 meeting, Commissioners asked about AT&T's alternative sites analysis and service coverage gap and asked if related equipment could be placed in an underground vault. *Id.* ¶ 37. Members of the public testified at the October 2021 meeting regarding the Facility's proximity to residences, speculated about a decrease in property values, and questioned the existence of AT&T's coverage gap. *Id.* ¶ 38. Residents, Commissioners, and Council Members commented about the nature of the proposed tower within the environment—that it would be significantly above the existing trees, would ruin residents' and visitors' views of mountains and city lights, that photo simulations were not representative of the visual impact, and that the tower could be raised an additional 20 feet without City review.[3] City SUF ¶ 7.

---

[3] The parties did not provide, and the Court is unaware of, the regulatory support for the view that City review would not be required or permitted for further increases to the height of the tower.

After multiple failed motion votes, the Commission continued the hearing to December 14, 2021, and requested that, prior to that meeting, AT&T (a) provide additional evidence of the service coverage gap; (b) investigate undergrounding some of the equipment; and (c) prepare additional photo simulations to depict the Facility from additional viewpoints. AT&T SUF ¶ 39. In advance of the December 14, 2021 meeting, AT&T submitted the following additional information in response to the Commission's request: (a) a Radio Frequency Statement with further explanation regarding the need for the Facility; (b) an engineer's letter explaining why certain equipment could not be placed underground; and (c) an updated photo simulation with additional views of the Facility. *Id.* ¶ 40. The data AT&T provided was based on projected models. City SUF ¶ 9. AT&T provided additional information regarding a potentially available alternative site at South Hills High School, which it ultimately ruled out based on the school's statement that it was not interested in leasing space to AT&T for the Facility. AT&T SUF ¶ 42.

Following the December 2021 meeting, the City Planning Commission denied AT&T's application. *Id.* ¶ 49. In its decision denying the application, the Commission found that (1) AT&T "was not able to provide quantifiable data that demonstrated that the proposed telecommunication facility is necessary or desirable to provide a service that will contribute to the general well-being of the neighborhood"; and (2) the Facility would "not accomplish reasonable 'stealthing' that will allow the facility to be screened and blend with the existing natural environment or built surroundings. The mono-eucalyptus, as designed, will be taller than any of the mature trees on the site and adjacent areas as demonstrated by the applicant's 'balloon test' and will be noticeably dissimilar in appearance in comparison to the other trees in the area." *Id.* ¶ 50. AT&T filed a timely appeal of the denial to the West Covina City Council. *Id.* ¶ 51. On February 15, 2022, the West Covina City Council held a public hearing on AT&T's appeal. *Id.* ¶ 57.

At the conclusion of the February 2022 hearing, the City Council voted to deny AT&T's appeal. *Id.* ¶ 69. On or about March 1, 2022, the City issued a written letter which stated that "On February 15, 2022, the City Council adopted Resolution No. 2022-17 Upholding the Planning Commission's decision and denying Conditional Use Permit No. 21-03." *Id.* ¶ 70. The Denial Resolution included three bases for denial of the Application. *Id.* ¶ 72. The first stated basis for

denial was "[t]he applicant was not able to provide quantifiable data that demonstrated that the proposed telecommunication facility is necessary or desirable to provide a service that will contribute to the general well-being of the neighborhood." *Id.* ¶ 73. The second stated basis for denial was

> The wireless telecommunication facility's mono-eucalyptus [sic] will not accomplish reasonable 'stealthing' that will allow the facility to be screened and blend with the existing natural environment or built surroundings. The mono-eucalyptus, as designed, will be taller than any of the mature trees on the site and adjacent areas as demonstrated by the applicant's "balloon test" and will be noticeably dissimilar in appearance in comparison to the other trees in the area.

*Id.* ¶ 75. The third stated basis for denial was that AT&T's

> Alternative Site Analysis report identifies several alternative sites which could address the gap in coverage including, but not limited to, a City-owned park adjacent to the proposed site. However, each alternative site is dismissed by applicant with a simple statement that applicant could not agree to lease terms. Applicant has not sufficiently established that terms for leasing alternative sites were so onerous they would materially limit or inhibit applicant.

*Id.* ¶ 76.

## III.   Discussion

AT&T contends that its Motion should be granted because (1) there is no substantial evidence in the written record to support the City's denial of AT&T's Application for the Proposed Facility, and (2) the City's denial of AT&T's application amounted to an effective prohibition in violation of Section 47 U.S.C. § 332(c)(7)(B)(i)(II). Mot. at 9–40. The City argues that judgment should be granted in its favor because (1) there is substantial evidence in the written record to support the City's denial of AT&T's Application for the Proposed Facility, and (2) the City's denial of AT&T's application did not amount to an effective prohibition in violation of Section 47 U.S.C. § 332(c)(7)(B)(i)(II). *Id.*

### A.   There is substantial evidence in the written record to support the City's denial of AT&T's application for the Proposed Facility (Second Cause of Action).

The City stated three bases for its denial of the Application: (1) AT&T was unable "to provide quantifiable data that demonstrated that the Proposed Facility is necessary or desirable to

provide a service that will contribute to the general well-being of the neighborhood"; (2) "[t]he wireless telecommunication facility's mono-eucalyptus will not accomplish reasonable 'stealthing' that will allow the facility to be screened and blend with the existing natural environment or built surroundings"; and (3) the Alternative Site Analysis report "identifies several alternative sites which could address the gap in coverage." AT&T SUF ¶¶ 72–73,75–76. AT&T contends that there was no substantial evidence in the written record to support the City's denial of its Application for the Proposed Facility because: (1) AT&T submitted industry-standard, verified data in support of the significant service coverage gap; (2) the Proposed Facility complies with all the City's stealthing and other siting and design requirements; and (3) AT&T thoroughly analyzed possible alternatives and found no other available sites upon which AT&T could feasibly construct the Proposed Facility. Mot. at 9–24.

i. <u>There is substantial evidence in the written record to support the City's finding that AT&T failed to demonstrate that the Proposed Facility was necessary or desirable.</u>

AT&T contends that the City's decision to deny the Application due to its inability to "provide quantifiable data that demonstrate[s] that the Proposed Facility is necessary or desirable" is unsupported by substantial evidence because (1) the West Covina Municipal Code does not require an applicant proposing a new wireless facility to provide quantifiable data demonstrating the necessity of the proposed facility, and (2) it *did* submit industry-standard, verified data in support of the significant service coverage gap. Mot. at 9–12.

1. *The West Covina Municipal Code requires applicants for a wireless facility to submit any information required by the planning director, which may include quantifiable data.*

As discussed above, West Covina Municipal Code § 26-247(a)(1) requires any applicant for a conditional use permit to show, among other requirements:

That the proposed use at the particular location **is necessary or desirable** to provide a service or facility which will **contribute to the general well being of the neighborhood or community**.

RJN, Ex. D (WEST COVINA, CAL., MUN. CODE § 26-247(a)(1) (2023)) (emphasis added).

The Code enumerates additional application requirements, including (1) "a wireless telecommunication master plan for city review and approval," (2) a "justification study . . . indicating the rationale for selection of the proposed site in view of the relative merits of any feasible alternative site within the service area," (3) a "co-location study" that "examine[s] the potential for co-location at an existing or a new site," (4) a visual analysis "to ensure visual and architectural compatibility with surrounding structures," and (5) "[o]ther relevant information requested by the planning director or his/her authorized representative." RJN, Ex. E (WEST COVINA, CAL., MUN. CODE § 26-685.997 (2023)). Although neither of these provisions cited by the City explicitly require applicants to submit "quantifiable data" demonstrating the necessity of a proposed facility, such data may reasonably fall within the scope of "other relevant information" requested by the planning director or an authorized representative of the director. As a result, the Court disagrees with AT&T's contention that it was not required to—and could not be required to—provide quantifiable data demonstrating the necessity of the proposed facility.

> 2. *AT&T failed to submit sufficient evidence to demonstrate the existence of a significant coverage gap.*

AT&T next contends that no substantial evidence supports the City's denial of its Application because it submitted industry-standard, verified data in support of the significant service coverage gap it sought to fill in West Covina—which, in turn, would make the Proposed Facility necessary or desirable. Mot. at 9–12. To demonstrate the existence of a significant service coverage gap, AT&T submitted: (1) a Radio Frequency Statement with further explanation regarding the need for the Proposed Facility; (2) an engineer's letter explaining why certain equipment could not be placed underground; and (3) a photo simulation with views of the Proposed Facility. City SUF ¶ 9; AT&T SUF ¶ 40. On the other hand, the Commission—in considering whether the Proposed Facility was "essential or desirable to the public convenience and welfare"—sought information regarding the number of residents who would be benefitted or impacted, requesting data regarding dropped calls or service problems of customers in the area. City SUF ¶ 8. However, AT&T refused to supply this information on the basis it was proprietary. The Commission further noted that the residential

area surrounding the Proposed Facility was more "rural," suggesting that the number of residents benefitted by the Proposed Facility would be limited.

Although the Court notes that the record appears to include evidence supporting both AT&T and the City's positions with regard to whether a significant service coverage gap existed, the Court ultimately finds that AT&T has not shown the absence of a genuine issue of material fact in its favor regarding whether it failed to submit *sufficient* evidence to demonstrate the existence of a significant service coverage gap and, as a result, that the Proposed Facility would be necessary or desirable. Based on the evidence before the Court, it finds that AT&T is not entitled to summary judgment on this ground—but the City is—because the undisputed facts show that AT&T *did not* submit *sufficient* evidence, as it declined to supply information regarding the number of residents who might benefit from the Proposed Facility. Moreover, the Court notes that the substantial evidence analysis requires the Court to look for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *MetroPCS*, 400 F.3d at 725. Review under this standard is "deferential," and a decision may not be overturned on "substantial evidence" grounds if the decision "is authorized by applicable local regulations and supported by a reasonable amount of evidence." *Id.* As such, the Court concludes that the undisputed facts show there is substantial evidence in the written record to support the City's finding that AT&T failed to demonstrate that the Proposed Facility was necessary or desirable.

ii.   There is substantial evidence in the written record to support the City's denial of AT&T's Application due to concerns regarding the Proposed Facility's stealthing and design.

AT&T further contends that no substantial evidence supports the City's denial of its Application because the Proposed Facility complies with the City's stealthing and other siting and design requirements. Mot. at 12–13. In particular, AT&T argues that the Proposed Facility meets the City's (1) 60-foot height limit, (2) separation requirements, and (3) design requirements that such facilities must "bear a realistic resemblance" to a eucalyptus tree, be placed near other mature trees and newly-planted live eucalyptus trees, with "maximum branch [] density "to the greatest extent

possible for antenna stealthing purposes," and have "'sock covers' installed over each antenna . . . for additional stealthing." *Id.* at 12.

The City denied AT&T's Application partially on the basis that the proposed tower would not "blend with the existing natural environment," because, although the tower was proposed to be stealthed as a mono-eucalyptus, it would "be taller than any of the mature trees on the site and adjacent areas . . . and will be noticeably dissimilar in appearance in comparison to the other trees in the area." City SUF ¶ 2. The Proposed Facility was to be built in a location adjacent to Heritage Park, which is identified in the City's General Plan as a Wilderness Park with woodlands and kept in a nature state. *Id.* ¶ 3. According to the General Plan, Heritage Park contains "native walnut and oak woodlands." RJN, Ex. F, at 123. The proposed location is zoned single family residential. City SUF ¶ 4. Nature trails and open space in the City of Walnut lie to the south of the residences south of the proposed project location. *Id.* ¶ 5. Moreover, Residents, Commissioners, and Council Members commented about the nature of the proposed tower within the environment—that it would be significantly above the existing trees, would ruin residents' and visitors' views of mountains and city lights, that AT&T's photo simulations were not representative of the visual impact, and that the tower could be raised an additional 20 feet without City review. *Id.* ¶ 7.

AT&T argued during the hearing on this matter that because its Proposed Facility met the City's Development and Design Standard requirements, this compliance with the Municipal Code warrants approval of its Application—in other words, the Development and Design Standards set forth the application characteristics necessary *and sufficient* to obtain approval of an application. However, the City contends that, pursuant to the Municipal Code, it is *necessary* for an application for a conditional use permit to *at minimum* comply with the Development and Design Standards, but compliance is not *sufficient* to obtain approval of an application.

The Court finds that the City's interpretation of the Development and Design Standards as minimum requirements—that are *necessary but not sufficient* to obtain approval—is supported by the plain language of the Code. As discussed previously, the Municipal Code provides:

> As part of a conditional use permit approval, **the planning commission may require development standards more strict than the regulations of this Code** (e.g., less sign area, less building coverage, lower density, increased parking,

increased fence or wall height, etc.) when such restrictions will mitigate potential impacts to surrounding properties or achieve **greater aesthetic or functional integration and compatibility with neighboring developments**.

WEST COVINA, CAL., MUN. CODE § 26-250 (emphasis added). Put differently, the Code makes clear that approval, rejection, and the specific standards for approval or rejection of a conditional use permit is discretionary. *See also id.* § 26-248 ("*Any application* for a conditional use permit may be *rejected*, approved, modified and approved, or approved subject to conditions."). As such, although it was required that AT&T's Application met the minimum requirements under the City's Development and Design Standards, meeting those requirements was not sufficient to obtain approval.

The Ninth Circuit has recognized that factors such as "the height of the proposed tower, the proximity of the tower to residential structures, the nature of uses on adjacent and nearby properties, the surrounding topography, and the surrounding tree coverage and foliage" are "legitimate concerns for a locality" considering a special use permit. *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 994 (9th Cir. 2009). Although the Proposed Facility may meet the minimum requirements set forth in the City's Development and Design Standard, the Court notes that this does not foreclose the possibility that the stealthing and design of the Proposed Facility nonetheless are inconsistent with the purpose stated in the Municipal Code to "eliminate or substantially reduce [wireless telecommunication facilities'] visual and aesthetic impacts from the surrounding public rights-of-way and adjacent properties." WEST COVINA, CAL., MUN. CODE § 26-685.989(c)(2). Indeed, A&T does not appear to dispute the City's finding that the Proposed Facility—despite complying with the Municipal Code's 60-foot height limit—would nonetheless be "taller than any of the mature trees on the site and adjacent areas." City SUF ¶ 2. Nor does AT&T appear to dispute the City's finding that the Proposed Facility—designed as a eucalyptus tree—would be "noticeably dissimilar in appearance in comparison to the other trees in the area," which include native walnut and oak woodlands. *Id.* These facts alone demonstrate that there is substantial evidence in the record to

support the City's denial of AT&T's Application due to concerns regarding the Proposed Facility's stealthing and design.[4]

Put another way, AT&T has not shown the absence of a genuine issue of material fact in its favor regarding whether there was substantial evidence in the record to support the City's denial on this basis. Based on the evidence before the Court, it finds that AT&T is not entitled to summary judgment on this ground—but the City is—because the undisputed facts show that there is substantial evidence in the record to support the City's denial, including the difference in the height and appearance of the Proposed Facility from the surrounding trees.

* * *

With both of these concerns raised by the City—specifically with respect to the existence of a significant coverage gap or the Proposed Facility's stealthing and design—the Court finds that a reasonable jury may conclude that there is more than a scintilla of evidence to support the City's denial of the Application. As such, the Court DENIES the Motion for Summary Judgment in favor of AT&T on the Second Cause of Action and GRANTS the Cross-Motion for Summary Judgment in favor of the City on the Second Cause of Action.

### B. A genuine dispute of material fact exists as to whether the City's denial of AT&T's application amounted to an effective prohibition in violation of the Federal Telecommunications Act of 1996 (First Cause of Action).

The Court next considers whether the City's denial of AT&T's application amounted to an effective prohibition under the Act. As discussed previously, a wireless service provider has the burden of establishing effective prohibition. *Anacortes*, 572 F.3d at 997–98. A provider may establish a prima facie case of effective prohibition by showing (1) it has a significant service gap, and (2) that its denied application proposes to close that gap by the least intrusive means. *MetroPCS*, 400 F.3d at 731; *Anacortes*, 572 F.3d at 997–98. A "provider makes a prima facie showing of effective prohibition by submitting a comprehensive application, which includes consideration of

---

[4] Because the Court has determined that there is substantial evidence in the written record to support the City's finding that AT&T failed to demonstrate that the Proposed Facility was necessary or desirable, the Court need not consider AT&T's third argument—that there was no evidentiary support for the City's findings regarding AT&T's alternative sites analysis. Mot. at 13–14.

alternatives, showing that the proposed [facility] is the least intrusive means of filing [sic] a significant gap." *Anacortes*, 572 F.3d at 997–98. Once that prima facie showing has been made, the locality may reject that showing, but only after demonstrating that there are some potentially available and technologically feasible alternatives. *Id.* The provider then has the opportunity to dispute the availability and feasibility of the alternatives favored by the locality. *Id.* "Where, as here, there is more than a scintilla of evidence to support a locality's disapproval of a particular site for a wireless cellular facility, a court's determination of whether the denial violates the TCA turns on an evaluation of the availability and technological feasibility of the alternatives." *Id.* at 996. AT&T contends that the City's denial of its Application amounts to an effective prohibition because (1) it has demonstrated a significant service gap, and (2) the Proposed Facility is the least intrusive means to close the gap and the City failed to meet its reciprocal burden to identify a less intrusive, available, and feasible alternative. The City argues that (1) AT&T has failed to meet its initial burden of demonstrating a significant service gap, and (2) the Proposed Facility was *not* the least intrusive means for closing the alleged service coverage gap because there are alternatives that AT&T has failed to explore. Mot. at 29–36.

   i.   A genuine dispute of material fact exists as to whether AT&T has met its initial burden of demonstrating a significant service gap.

AT&T argues that it has demonstrated a significant service coverage gap in the vicinity of the Proposed Facility. MSJ at 25–27. In particular, AT&T (1) cites to a declaration from its expert, Ozgur Celik, who opined that AT&T is unable to meet its in-building service coverage standard in this area without the Proposed Facility, MSJ at 25–27 (citing AR at 216–21), and (2) points out that the City's expert, Ben Levitan, acknowledged that there is a wide gap in AT&T's LTE service coverage in the larger geographic area and concluded that the Proposed Facility would close 32% of the gap, ECF No. 45-13, Ex. A ("Levitan Dep. Tr.") at 43:11–13, 72:18–73:15. However, the City has also furnished evidence in support of its contention that AT&T has failed to demonstrate the significant service gap. In particular, the City notes that (1) the maps that AT&T proposed to reflect a gap in coverage involved 4G LTE service, but other service levels available in West Covina were not similarly vetted, and that (2) the drive tests performed by AT&T in support of their position of a

coverage gap tested for in-building steel commercial building coverage and in-vehicle coverage, both which are poor comparators for determining coverage in *residences*.

Here, there exists a dispute between AT&T's expert and the City's expert as to whether a significant service gap exists in the area of the Proposed Facility. Viewing the evidence in the light most favorable to the City, as it must on AT&T's motion for summary judgment, the Court finds that a reasonable jury may conclude that AT&T failed to meet its burden of demonstrating that a significant service coverage gap exists, given the potential flaws in the sources that AT&T has provided in support of its purported service coverage gap—specifically, its maps and drive tests. However, viewing the evidence in a light most favorable to AT&T, as it must on the City's cross-motion for summary judgment, the Court similarly finds that a reasonable jury may also conclude that AT&T sufficiently done so, given the evidence submitted—including the aforementioned maps, drive tests, and witness testimony.

    ii.   <u>A genuine dispute of material fact exists as to whether the City has shown that any available alternatives exist.</u>

The "least intrusive" prong requires the provider to show that "the manner in which it proposes to fill the significant gap in service is the *least intrusive on the values that the denial sought to serve*." *Id.* at 996 n.10 (emphasis added) (quoting *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 480 (3d Cir. 1999)). AT&T contends that it identified the proposed site—the subject water district site—as the only available and feasible way to close its gap. Mot. at 27. In support of this argument, it points to three items: (1) a report by City Staff concluding that the proposed site was appropriate, AT&T SUF ¶ 18; (2) testimony from its expert concluding that the Proposed Facility at this location was an appropriate choice given its location near water tanks in the large, hilly residential area, ECF No. 45-8 ("Celik Decl.") ¶¶ 15–17; and (3) AT&T's Alternative Site Analysis Report, which noted the infeasibility of building a facility on two City-owned properties, two private-property sites, and a high school. *Id.* at 13–15, 27, 36–40. The first item—the City Staff Report—is a report written by City staff in October 2021 recommending approval of the Proposed Facility, noting that "because of the existing landscaping and the proposed landscaping surrounding the proposed facility, the proposed location is a good location for such a facility." AT&T SUF ¶ 18.

The second item—AT&T's expert testimony—is a declaration by AT&T's expert, Celik, who stated that "[T]he Proposed Facility will close the coverage gap by providing an in-building level of 4G LTE service to an area 'roughly bordered by East Virginia Avenue to the north, Palomino Drive to the east, East Country Hollow Drive to the south, and Barranca Street to the west.' Because wireless signals cannot pass through hills and because AT&T's Proposed Facility will propagate signals in this hilly terrain from three directional antenna sectors, the new in-building service area will be irregularly shaped." Celick Decl. ¶ 17. The third item—AT&T's Alternative Site Analysis Report— consists of a report in which AT&T noted that two City-owned properties were unavailable because the City declined to discuss them as potential siting options with AT&T. AT&T SUF ¶ 32. In that report, AT&T also reviewed private property in the area but ultimately determined it to be unavailable because the land was owned by a developer who declined to lease space to AT&T. *Id.* ¶ 33. Finally, in that report, AT&T also explored an alternative site at South Hills High School, but ruled it out as an option after the school provided a statement that it was not interested in leasing space to AT&T for the Proposed Facility. *Id.* ¶ 42. The Court finds that AT&T has, at the very least, made a prima facie showing of effective prohibition by submitting a comprehensive application, which includes consideration of alternatives, showing that the Proposed Facility is the least intrusive means of filling a significant gap. *Anacortes*, 572 F.3d at 998. The burden now shifts to the City to demonstrate that there are potentially available and technologically feasible alternatives. *Id.*

Here, the Court concludes that a genuine dispute of material fact exists as to whether the City has shown that any such available alternatives exist. In its Opposition, the City argues that AT&T (1) did not explore the possibility of using small cell or micro cell facilities, which could be attached to existing street poles, or cellular arrays attached to buildings, (2) failed to consider building the Proposed Facility in commercial areas, (3) failed to negotiate with the City in good faith to locate its Proposed Facility on City property, and (4) declined to consider collocation at Watercress, an existing tower. Mot. at 29–36.

The City's expert opined that "one of the best alternatives that should be discussed is the deployment of 'small cells,'" which are "mounted high on street lights, utility poles, buildings[,] or other structures," and which "provide coverage for a range of about two miles." ECF No. 45-15, Ex.

C ("Levitan Report"), at 19–20. The expert report further states, "four small cells, configured to provide LTE service, readily available from AT&T, would resolve 90 percent of the poor coverage problems. As will be shown in the next sections, the remaining 10 percent is easily resolved with existing equipment. Installation of these small cells on streetlights, as is currently in AT&T's practice, solves the numerous issues associated with this application." *Id.* In response, AT&T explained that small cells are not appropriate in this situation and are not feasible solutions to address AT&T's significant service coverage gap in this case. Mot. at 39; *see also* Celick Decl. ¶¶ 43–44 ("[S]mall cells are typically used to provide capacity relief or to densify existing network coverage. Even if small cells were deployed to provide an initial later of in-building service coverage (which they are not), each small cell would only provide in-building level of service for a few hundred feet under ideal conditions. Even if AT&T attempted to deploy enough small cells to cover the same area as the Proposed Facility, it would need to deploy many dozens of small cell facilities. Even then, AT&T could not provide reliable in-building service throughout the target gap area. Likely, there would still be numerous coverage holes throughout the entire area.").

During the hearing on this matter, AT&T argued that although small cells would typically be placed on utility poles, two City regulations—the Small Wireless Facility Design Guidelines and Municipal Code Section 26-685.988(b)(2)—prevent the construction of such facilities and installation of small cells within 100 feet of houses. The City argued that one of the provisions referenced by AT&T—the Small Wireless Facility Design Guidelines—merely provides guidelines for streamlined approval of an *administrative use* permit; they are not requirements for a conditional use permit and they do not prohibit the installation of small cells within 100 feet of houses. In particular, they point to the Small Wireless Facility Design Guidelines, *see* Small Wireless Facility Design Guidelines, which provide:

> **Review Process** – Small cells require an administrative use permit per WCMC Section 26-685.985. Staff will be recommending approval if facility complies with the following design standards.
>
> **Location** – Locate 100 feet away from properties used for residential purposes.

*Id*. AT&T noted that whether the approval standard could be relaxed for individuals not seeking a streamlined approval process was, at best, "speculative," but contended that the City's Municipal Code itself had a separate 100-foot setback provision. Under the City's Municipal Code,

> No free-standing wireless facilities shall be permitted within one hundred (100) feet of surrounding single- or multi-family residences. This distance shall be determined by measuring from the free-standing wireless facility to the nearest property line of the single- or multi-family residence.

West Covina, Cal., Mun. Code § 26-685.988(b)(2). In response, the City claimed that small cells would be considered "[w]ireless telecommunication facilities located in the public right-of-way" and therefore exempt from the 100-foot setback provision. *Id.* § 26-685.983 ("The regulations of this division do not apply to . . . [w]ireless telecommunication facilities located in the public right-of-way.").

Here, there exists a dispute between AT&T's expert and the City's expert as to whether small cells are an available and technologically feasible alternative to the Proposed Facility. Viewing the evidence in the light most favorable to the City, as it must on AT&T's motion for summary judgment, the Court finds that a reasonable jury may conclude that the City *sufficiently* furnished evidence that an available and technologically feasible alternative exists. However, viewing the evidence in a light most favorable to AT&T, as it must on the City's cross-motion for summary judgment, the Court conversely finds that a reasonable jury may also conclude that the City *failed* to sufficiently furnish such evidence.

\* \* \*

In light of the foregoing, the Court therefore DECLINES to grant the Motion in favor of either side on the First Cause of Action.[5]

///

///

---

[5] Because the Court finds that a reasonable jury may conclude that the City sufficiently provided evidence that an available and technologically feasible alternative exists—specifically, with the installation of small cells—the Court need not consider the City's additional proposed alternatives, such as building the Proposed Facility in commercial areas, locating the Proposed Facility on City property, or collocation at Watercress, an existing tower.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court hereby ORDERS as follows:

1. The Motion for Summary Judgment is DENIED with respect to both the First and Second Causes of Action (ECF No. 45);

2. The Cross-Motion for Summary Judgment is GRANTED with respect to the Second Cause of Action but DENIED with respect to the First Cause of Action (ECF No. 45); and

3. The Request for Judicial Notice is GRANTED (ECF No. 45-16).


IT IS SO ORDERED.


Dated: July 10, 2023

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge